IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| SUNDAY'S CHILD, LLC, SUNDAY'S THIRD CHILD, LLC, SUNDAY'S FOURTH CHILD, LLC, AND SUNDAY'S FIFTH CHILD, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>IRONGATE AZREP BW LLC, JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; AND DOE ENTITIES 1-10,<br><br>Defendants. | CIVIL NO. 13-00502 DKW-RLP<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

**INTRODUCTION**

Before the Court is Defendant Irongate AZREP BW LLC's ("Defendant" or "Irongate") Motion to Dismiss Complaint ("Motion"), filed on October 10, 2013.  Plaintiffs Sunday's Child, LLC, Sunday's Third Child, LLC, Sunday's Fourth Child, LLC, and Sunday's Fifth Child, LLC ("Plaintiffs" or

1

"Sunday's Entities") opposed the Motion. The Court held a hearing on the Motion on December 12, 2013. After careful consideration of the supporting and opposing memoranda, the arguments of counsel, and the relevant legal authority, the Motion is hereby GRANTED.

## BACKGROUND

Plaintiffs filed a Complaint in Hawai'i state court seeking to recover deposits paid under Sales Contracts for four condominium units in the Trump International Hotel & Tower at Waikiki Beach Walk ("Project"). Defendant, the Project's developer, removed the action to this Court on October 3, 2013.

Plaintiffs allege that in November 2006, the Sunday's Entities executed separate Sales Contracts to purchase the four Project units, paying twenty percent of the purchase price as a deposit to Defendant. Complaint ¶¶ 9-10. Plaintiffs' failure to perform under the contracts entitled Defendant to the right to terminate. In that event, the Sales Contracts permitted Defendant to retain fifteen percent of the sales prices of the units with any deposit overage being returned to Plaintiffs. Complaint ¶¶ 12-13.

In July 2009, a series of disputes arose between Defendant and many prospective purchasers, including Plaintiffs. At the time, Plaintiffs allege that Defendant did not permit purchasers to close on Project units, despite Defendant's

assurances that the Project would be complete by that time.  On May 13, 2011, Plaintiffs entered into a Settlement Agreement with Defendant that resolved their dispute.  Complaint ¶¶ 14-16.  The Settlement Agreement was negotiated by Plaintiffs' prior counsel, who also represented other Project purchasers not parties to the instant suit.  Pursuant to the Settlement Agreement: (1) the parties agreed to substitute lower-priced Unit 3208 in exchange for Unit 3607, one of the four units originally contracted for; (2) Defendant agreed to allocate the deposit paid for Unit 3607 towards the purchase of Unit 3208; (3) Plaintiffs made an additional $50,000 deposit; (4) Plaintiffs were afforded additional time in which to close on the four units; (5) Plaintiffs were to receive certain credits and experience incentives upon timely closing; and (6) the parties mutually released claims existing between them as of the date of the Settlement Agreement.  Complaint ¶ 17; Settlement Agreement at 1-4.[1]  According to Plaintiffs, the Settlement Agreement did not modify the Sales Contracts, including Defendant's obligation to return any deposits exceeding fifteen percent of the sales price in the event of termination.  Complaint ¶¶ 18-19.

---

[1] The Settlement Agreement is discussed in some detail in, but is not attached to, the Complaint. *See, e.g.*, Complaint ¶¶ 17-20.  Nonetheless, the Court may, and, in this case, does, consider the Settlement Agreement as part of the pending Motion without converting it into a motion for summary judgment.  *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Inlandboatmens Union of Pacific v. Dutra Group*, 279 F.3d 1075, 1083 (9th Cir. 2002).

After executing the Settlement Agreement and making the additional $50,000 deposit, Plaintiffs sought financing to complete the purchases of the units, but were unsuccessful. Plaintiffs claim that Defendant's alleged delay in making the units available forced Plaintiffs to seek financing in a different financial market than existed previously and that lenders had significantly changed their lending requirements. Unable to finance and close on the units, Defendant elected to terminate the Sales Contracts on June 23, 2011. Plaintiffs demanded that Defendant return all deposits in excess of fifteen percent of the sales price, but Defendant declined to do so. Complaint ¶¶ 20-26.

Plaintiffs allege that Irongate breached the Sales Contracts by failing to return the excess deposits and to release certain escrow funds to them (Count I). They seek a declaration to the same effect (Count II). Plaintiffs also allege claims for conversion (Count III), tortious breach of contract (Count IV), unjust enrichment (Count V) and breach of the implied covenant of good faith and fair dealing (Count VII), and seek punitive damages (Count VI).

According to Irongate, Plaintiffs waived any claim to the return of their initial deposits when they entered into and then breached the Settlement Agreement, failing to pay additional deposits due and failing to timely close on the four units.

4

Irongate moves to dismiss the Complaint with prejudice, arguing that Plaintiffs' claims are barred by the express terms of the Settlement Agreement.

## STANDARD OF REVIEW

Defendant brings the Motion pursuant to Federal Rules of Civil Procedure 12(b)(6). Rule 12(b)(6) permits a motion to dismiss a claim for failure to state a claim upon which relief can be granted. Pursuant to *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 555 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## DISCUSSION

I. **Breach of Contract Claim**

Under Hawai'i law, "[a]s a general rule, a properly executed settlement precludes future litigation for its parties." *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Hawai'i 277, 288, 172 P.3d 1021, 1032 (2007) (citation omitted); *see also Amantiad v. Odum*, 90 Hawai'i 152 161, 977 P.2d 160, 169 (1999) ("We particularly note our longstanding support of compromise and settlement. As a general rule, a properly executed settlement precludes future litigation for its parties."); *Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 570, 825 P.2d 1053, 1059 (1992) ("A compromise or settlement agreement disposes of all issues the parties intended to settle.") (citation omitted). Settlement agreements "bring[] finality to the uncertainties of the parties" and their enforcement is "consistent with [the Hawaii Supreme Court's] policy to foster amicable, efficient, and inexpensive resolution of disputes." *Exotics Hawaii-Kona, Inc.*, 116 Hawai'i at 288, 172 P.2d at 1032. Settlement agreements "are simply a species of contract" and are governed by the principles of contract law. *Wong v. Cayetano*, 111 Hawai'i 462, 481, 143 P.3d 1, 20 (2006); *see also State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Hawai'i 315, 323-24, 978 P.2d 753, 761-62 (1999).

Section 8 of the Settlement Agreement states:

8. <u>Purchaser's Release.</u>  Each Releasor and each of such releasor's members, successors, heirs, assigns, parents, owners, investors, managers, agents, officers, directors, employees, attorneys, lenders, insurers and affiliates (collectively, "Releasor") hereby releases Releasee and each of Releasee's member, successors, heirs, assigns, parents, owners, investors, managers, agents, officers, directors, employees, attorneys, lenders, insurers and affiliates (collectively, "Released Parties") from the claims made or asserted or that could have been made or asserted, in the Litigation, including but not limited to claims for equitable and/or legal relief and including damages of any and all kind; provided, however, that this release does not include or release claims that Releasor may have arising (a) after the execution of this Agreement, (b) out of any design or construction defect claims, known or unknown, and (c) out of the contractual duties, rights or obligations of the Released Parties, if any, relating in any way to the (i) management and/or operation of the Front Desk Unit, (ii) the Home Owners Association ("HOA"), including without limitation and claims made by or on behalf of the HOW, and any claims made against the HOA, and/or (iii) the assignment or non-assignment of the Trump License to the HOA.  **In other words, upon the execution of this Agreement, this release is intended to forever release and waive any and all claims by the Releasor arising out of the purchase and sale of the Units and the Litigation, but is not intended to release, limit or impair in any respect Releasor's claims as owner of the Units existing after the execution of this Agreement, subject to and limited only by the release described in this paragraph.**  To the extent Releasor is a party to the Litigation, Releasor also agrees to execute a stipulation for dismissal with prejudice of any and all claims that have been, or could have been, made or asserted in accordance with the terms of this release.

7

Settlement Agreement at 3-4 (emphasis added).  The bold language above unambiguously releases Defendant from any claims arising out of the purchase and sale of the four units—necessarily including those relating to the purchase deposits made by Plaintiffs here—existing at the time the Settlement Agreement was executed.

While the term "Litigation" as used in Section 8 is not specifically defined in the Settlement Agreement, the only reasonable interpretation of the term is that it refers to several lawsuits pending at the time, which are specifically identified in the document.  The first page of the Settlement Agreement states:

> Whereas, lawsuits were filed by certain prospective buyers of units at the Project, to wit, Santana, et al., v. Irongate AZREP BW LLC, et al, Hawaii 1st Cir. Civil No. 09-1-1605 RMB (complaint filed July 13, 2009) and 1013 LLC, et al. v. Irongate AZREP BW LLC, et al., U.S.D.C. No. CV 09-00315 ACK/KSC (complaint filed July 13, 2009) (collectively, the "Buyers' Suit"); as well as a lawsuit filed by the Releasee against certain buyers, to wit, Irongate AZREP BW LLC, v. Mani et al., Hawaii 1st Cir. Civil No. 09-1-1676-07 RMB (complaint filed July 20, 2009) ("Seller's Suit").

*Id.* at 1.  The parties do not dispute that the Litigation referred to in Section 8 encompasses the Buyer's Suit and Seller's Suit, as defined above.  The Buyers' Suit expressly sought to recover deposits from Irongate paid to purchase units in the

Project.[2]  *See* Ex. 2 at 16 (Complaint filed in *1013 LLC v. Irongate AZREP BW LLC*, CV 09-00315 ACK/KSC).   As a result, Plaintiffs' efforts to recover their purchase deposits here are barred by Section 8 of the Settlement Agreement. (barring "claims made or asserted or that could have been made or asserted, in the Litigation, including but not limited to claims for equitable and/or legal relief and including damages of any and all kind").

At the time of the Settlement Agreement, Irongate considered Plaintiffs to be in default under the Sales Contracts for failing to close by the specified dates, and, accordingly, agreed to extend the closing date as partial consideration for the settlement.  *See* Settlement Agreement at 2-3.   There is no dispute that Plaintiffs failed to make the required "additional non-refundable payments" or to otherwise timely close as spelled out in Section 4 of the Settlement Agreement.   Under Section 4, "[s]hould all Purchasers fail to close by June 27, 2011, or no later than thirty (30) days thereafter subject to the Extension Fee, all Purchasers will forfeit to Seller all additional non-refundable payments made pursuant to this section 4 and,

---

[2] Plaintiffs were not parties to "the Buyers' Suit or the Seller's Suit, but such Purchasers' rights to participate in and/or pursue claims made or asserted in the Buyers' Suit were preserved by agreement of counsel."   Settlement Agreement at 2.

9

furthermore, release all rights and claims pursuant to section 8." *Id*. Plaintiffs forfeited all deposits previously paid for this additional reason.

Plaintiffs argue that the express terms of the Settlement Agreement exclude their current claims for relief because they arose after the Settlement Agreement was executed. Employing Plaintiffs' logic, because Irongate terminated the Sales Contracts on June 23, 2011, the claims presently asserted could not have been included in the claims released when the Settlement Agreement was executed on May 13, 2011. The Court disagrees. The Buyers' Suit, filed in 2009, expressly demanded the return of deposits paid to Irongate under existing sales contracts. Moreover, the Seller's Suit alleged that prospective purchasers breached their respective sales contracts by repudiating or failing to perform under them, for which Irongate sought specific performance. Ex. D at 11, 14 (Complaint filed in *Irongate AZREP BW LLC v. Mani*, Civ. No. 09-1-1676-07 RBM). Accordingly, Plaintiffs' current claims did not simply arise after the Settlement Agreement was executed on May 13, 2011. They involve deposits made at a much earlier date, specifically for purchase of the Project units, pursuant to Sales Contracts entered at a much earlier date. That is precisely what Section 8 barred (*e.g.* claims "arising out of the purchase and sale"). The post-Settlement Agreement claims that were preserved essentially concern issues that were not discoverable by a

pre-construction purchaser, such as Plaintiffs (*e.g.* those based on construction defect).[3] That is not the basis of the claims asserted here. Finally, the Court notes that the parties, both represented by counsel, could have incorporated an exception for purchase deposits into the text of Section 8, but did not do so, and the Court declines Plaintiffs' invitation to imply one.

The Court finds that the claims asserted in this action clearly "aris[e] out of the purchase and sale of the Units" as set forth in Section 8 of the Settlement Agreement, and are therefore waived under the Settlement Agreement. Accordingly, the Court GRANTS the Motion with respect to Plaintiffs' claim for breach of contract (Count I).

## II. Remaining Claims

To the extent Plaintiffs' remaining claims for declaratory relief (Count II), conversion (Count III), tortious breach of contract (Count IV), unjust enrichment

---

[3]Section 8 enumerates several types of claims that are not waived by the Settlement Agreement: "claims that Releasor may have arising (a) after the execution of this Agreement, (b) out of any design or construction defect claims, known or unknown, and (c) out of the contractual duties, rights or obligations of the Released Parties, if any, relating in any way to the (i) management and/or operation of the Front Desk Unit, (ii) the Home Owners Association ("HOA"), including without limitation and claims made by or on behalf of the HOA, and any claims made against the HOA, and/or (iii) the assignment or non-assignment of the Trump License to the HOA." Settlement Agreement at 3.

(Count V), and breach of the implied covenant of good faith and fair dealing are covered by the Settlement Agreement, they likewise fail.

Whether construed as arising under contract or tort law, all of these claims are based on the Sales Contracts because Plaintiffs seek the recovery of deposits paid pursuant thereto. Plaintiffs argue that "because Irongate violated the express terms of the Sales Contracts by refusing to return the excess Contract Deposits, the complaint states valid claims for Conversion, Tortious Breach of Contract, Unjust Enrichment, Punitive Damages, and Breach of the Covenant of Good Faith and Fair Dealing." Mem. in Opp. at 10. These claims are barred by the Settlement Agreement, for the reasons set forth above, and Plaintiffs cannot maintain these causes of action for that reason alone.

Additionally, Plaintiffs' reliance on the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1703(d)(3), is misplaced because, among other things, they did not seek to void either the Sales Contracts or the Settlement Agreement within two years of their respective executions. *See* 15 U.S.C. § 1703(d) (allowing for revocation "at the option of the purchaser or lessee for two years from the date of the signing of such contract or agreement").

Moreover, Plaintiffs fail to state claims as a matter of law with respect to Count IV (tortious breach of contract)[4] and Count VII (breach of the implied covenant of good faith and fair dealing).[5]  Nor can Plaintiffs maintain a stand-alone claim for punitive damages (Count VI).  *See Kang v. Harrington*, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978) ("An award of punitive damages is purely incidental to the cause of action.").

Accordingly, the Motion is GRANTED as to the balance of Plaintiffs' claims.

---

[4] "Hawai'i law will not allow a recovery in tort, including a recovery of punitive damages, in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends the breach of the contract." *Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 244, 971 P.2d 707, 708 (1999) (abolishing tortious breach of contract cause of action).

[5] With this Count, Plaintiffs attempt to assert the tort of "bad faith."  *See Best Place v. Penn Am. Ins. Co.*, 82 Hawai'i 120, 128, 920 P.2d 334, 342 (1996) (adopting tort of bad faith for breach of implied covenant of good faith and fair dealing in an insurance contract).  This cause of action, however, has not been recognized in Hawai'i outside of the insurance context.  *See Jou v. Nat'l Interstate Ins. Co. of Haw.*, 114 Hawai'i 122, 129, 157 P.3d 561, 568 (App. 2007) (explaining that "the Hawaii Supreme Court emphasized that the tort of bad faith, as adopted in [*Best Place*,] requires a contractual relationship between an insurer and an insured" (citations omitted)); *see also Francis*, 89 Hawai'i at 238, 971 P.2d at 711 ("Other jurisdictions recognizing the tort of bad faith . . . limit such claims to the insurance context or situations involving special relationships characterized by elements of fiduciary responsibility, public interest, and adhesion.").  Moreover, "[t]he covenant [of good faith] does not impose any affirmative duty of moderation in the enforcement of legal rights." *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 884 (N.D. Cal. 2010) (citation and quotation marks omitted).  Plaintiffs, therefore, fail to state a claim for bad faith.

## **CONCLUSION**

On the basis of the foregoing, the Court hereby GRANTS Defendant Irongate AZREP BW LLC's Motion to Dismiss Complaint, filed on October 10, 2013. There being no remaining claims or parties, the Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI'I, February 4, 2014.



Derrick K. Watson
United States District Judge

---

Sunday's Child, LLC, et al v. Irongate AZREP BW LLC, et al.;
CV 13-00502 DKW-RLP;
ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

14