IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| SUNDAY'S CHILD, LLC,<br>SUNDAY'S THIRD CHILD, LLC,<br>SUNDAY'S FOURTH CHILD, LLC,<br>and SUNDAY'S FIFTH CHILD, LLC,<br><br>      Plaintiffs,<br><br>  vs.<br><br>IRONGATE AZREP BW LLC,<br><br>      Defendant. | CIVIL NO. 13-00502 DKW-RLP<br><br><br>**ORDER (1) GRANTING DEFENDANT IRONGATE'S MOTIONS FOR SUMMARY JUDGMENT; AND (2) GRANTING IN PART AND DENYING IN PART IRONGATE'S MOTION FOR SANCTIONS** |

## INTRODUCTION

Irongate seeks summary judgment on the Sunday's Companies'[1] remaining

claims for breach of contract, conversion, and unjust enrichment, as well as on its

own Counterclaim for breach of contract arising out of the failure of the Sunday's

Companies to close on the sale of four condominium units in Honolulu, Hawaii.

The Sunday's Companies' claims each turn on the parties' intent with respect

to the material terms of a 2011 Agreement.   Consistent with the Ninth Circuit's

---

[1]The Court refers to the four Plaintiff LLCs collectively as the "Sunday's Companies."   They are Sunday's Child, LLC; Sunday's Third Child, LLC; Sunday's Fourth Child, LLC; and Sunday's Fifth Child, LLC, and whose sole owner/member/manager is Ingrid Sunday Wang.

direction on remand, the parties present evidence on summary judgment of their intent and understanding of the material terms of the 2011 Agreement, terms that the Ninth Circuit determined were ambiguous.   That evidence reveals that although Wang, the Sunday's Companies' owner, did not read or understand the 2011 Agreement that she admittedly executed, her attorneys negotiating the Agreement on her behalf understood its terms.   Contemporaneous with the Agreement, these attorneys advised Wang that the Agreement waived and released Plaintiffs' claims to recover their original deposits paid for the four units in 2006.   Irongate's interpretation was no different.   Accordingly, because Plaintiffs' instant claims each seek the return of those original deposits released by the 2011 Agreement, the Court GRANTS Irongate's Motion for Summary Judgment on Plaintiffs' First Amended Complaint (Dkt. No. 132).

The evidence is equally unequivocal that the Sunday's Companies breached the 2011 Agreement by failing to make additional non-refundable payments when due and failing to close.   As a result, Irongate is likewise entitled to summary judgment on its Counterclaim for Plaintiffs' Breach of Contract for Failure to Make the Additional Nonrefundable Payment (Dkt. No. 134).

Finally, because Wang and certain Plaintiffs' counsel, with full knowledge of the parties' intent with respect to the 2011 Agreement, advanced untenable theories of liability, interpreting the 2011 Agreement contrary to the undisputed evidence,

and certified pleadings to the Court based upon what can only be seen as a misrepresentation, the Court GRANTS IN PART Irongate's Motion for Sanctions (Dkt. No. 202).

## BACKGROUND

### I.    Factual Background

The Sunday's Companies seek to recover deposits paid under Sales Contracts for four condominium units in the Trump International Hotel & Tower at Waikiki Beach Walk (the "Project").   As a result of the Sunday's Companies' failure to close, Irongate, the Project's developer, contends that it is entitled to retain the original deposits and the additional non-refundable payment made by Plaintiffs following a 2011 Agreement between the parties.   Irongate also seeks the balance of the additional non-refundable payments due under the Agreement that were never made.

#### A.    2006 Sales Contracts and 2011 Agreement

On November 9, 2006, the Sunday's Companies executed separate Sales Contracts to purchase four Project units, advancing twenty percent of the collective purchase price as a deposit to Irongate.   Irongate Ex. X, Dkt. No. 133-25.   These original deposits totaled $1,439,320, and the Sales Contracts indicated a cash purchase that was not conditioned on buyer financing.   *Id.*; 12/12/17 Jason Grosfeld Dep. Tr. 60, Dkt. No. 133-7.   The Project was scheduled for construction and

completion within six years, and under the identical Sales Contracts, Irongate could

determine the closing date. In the event of default by the Sunday's Companies,

Irongate was permitted to terminate, and Section D.37 of the Sales Contracts

generally permitted Irongate to retain fifteen percent of the sales prices of the units

with any deposit overage being returned to the purchaser.[2] Wang did not read the

---

[2]Section D.37 of the Sales Contracts provides:

> 37. SELLER'S REMEDIES UPON DEFAULT BY PURCHASER. IN THE
> EVENT PURCHASER SHALL HAVE DELIVERED THE CONTRACT
> DEPOSIT (OR PORTION THEREOF REQUIRED TO BE DELIVERED)
> PURSUANT TO THIS SALES CONTRACT, AND SHALL FAIL TO COMPLY
> WITH OR PERFORM ANY OF THE COVENANTS, AGREEMENTS OR
> OTHER OBLIGATIONS TO BE PERFORMED BY PURCHASER UNDER THE
> TERMS AND PROVISIONS OF THIS SALES CONTRACT, INCLUDING,
> WITHOUT LIMITATION, DELIVERY OF THE SECOND DEPOSIT TO
> ESCROW ON OR PRIOR TO THE SECOND DEPOSIT DELIVERY DATE,
> SELLER SHALL PROVIDE PURCHASER WITH WRITTEN NOTICE OF
> SUCH DEFAULT OR BREACH AND THE OPPORTUNITY FOR
> PURCHASER TO REMEDY SUCH DEFAULT OR BREACH WITHIN
> TWENTY (20) DAYS AFTER THE DATE OF RECEIPT OF SUCH NOTICE.
> IF PURCHASER HAS NOT REMEDIED SUCH DEFAULT OR BREACH
> WITHIN SUCH TWENTY (20)-DAY PERIOD, SELLER SHALL BE
> ENTITLED TO ANY REMEDY AVAILABLE IN LAW OR IN EQUITY
> INCLUDING, WITHOUT LIMITATION, (I) SPECIFIC PERFORMANCE OF
> THIS SALES CONTRACT AND THE TERMS AND CONDITIONS SET
> FORTH THEREIN, OR (II) TERMINATION OF THIS SALES CONTRACT
> UPON WRITTEN NOTICE TO PURCHASER, WHEREUPON SELLER SHALL
> BE PAID THE CONTRACT DEPOSIT, AND ALL ACCRUED INTEREST, AS
> FIXED AND FULL LIQUIDATED DAMAGES. PURCHASER
> ACKNOWLEDGES THAT IT IS IMPOSSIBLE TO MORE PRECISELY
> ESTIMATE THE SPECIFIC DAMAGES TO BE SUFFERED BY SELLER FOR
> WHICH LIQUIDATED DAMAGES ARE PAYABLE PURSUANT TO THIS
> SALES CONTRACT, BUT THAT THE APPLICABLE SUM STIPULATED AS
> THE AMOUNT OF THE LIQUIDATED DAMAGES IS A REASONABLE
> AMOUNT. NOTWITHSTANDING THE FOREGOING, IF PURCHASER
> LOSES ITS RIGHTS AND INTEREST IN THE UNIT AS A RESULT OF
> PURCHASER'S BREACH OR DEFAULT UNDER THIS SALES CONTRACT

Sales Contracts before signing them.   10/6/17 Wang Dep. Tr. 33, 254–55, Dkt. No. 162-2.

In July 2009, a series of disputes arose between Irongate and several purchasers, including the Sunday's Companies.   Several prospective purchasers filed at least two lawsuits against Irongate (the "Buyers' Suits"), alleging statutory and common law claims, based upon misrepresentations during the sales process. The plaintiff purchasers in the Buyers' Suits sought to nullify and rescind their Sales Contracts and obtain return of their deposits.[3]   The plaintiffs in these suits were represented by Hawaii attorney Warren Price.   The Sunday's Companies were not named parties in the Buyers' Suits, but were represented by Price, and by agreement

---

AFTER FIFTEEN PERCENT (15%) OF THE PURCHASE PRICE HAS BEEN PAID BY PURCHASER, (EXCLUSIVE OF ANY INTEREST ACCRUED THEREON), SELLER SHALL REFUND TO PURCHASER ANY AMOUNT THAT REMAINS AFTER SUBTRACTING (A) FIFTEEN PERCENT (15%) OF THE PURCHASE PRICE OF THE UNIT (EXCLUSIVE OF ANY INTEREST EARNED THEREON), OR THE AMOUNT OF DAMAGES INCURRED BY SELLER AS A RESULT OF SUCH BREACH, WHICHEVER IS GREATER, FROM (B) THE AMOUNT PAID BY PURCHASER WITH RESPECT TO THE PURCHASE PRICE OF THE UNIT, EXCLUDING ANY INTEREST EARNED THEREON.

Irongate Ex. X, Dkt. No. 133-25.

[3]The Buyers' Suits include *Santana, et al. v. Irongate AZREP BW LLC, et al.,* filed in Hawaii state court, Civil No. 09-1-1605-07 RMB, and *1013 LLC, et al. v. Irongate AZREP BW LLC, et al.*, filed in this district court, CV No. 09-00315 ACK-KSC.   Irongate file a countersuit against the *Santana* plaintiffs for specific performance, breach of contract, and tortious interference with contractual relations, on July 13, 2009, in *Santana, et al. v. Irongate AZREP BW LLC, et al.,* Civil No. 09-1-1605-07 RMB.   *See* Dkt. No. 166.

of counsel, preserved their rights to pursue claims made or asserted in the Buyers'
Suits and postponed their closing dates.

Wang was introduced to Price by her attorney, Lyle Hosoda.   Hosoda
previously represented Wang on other real estate matters, but did not have a formal
engagement agreement with her with respect to the acquisition of the four units in
the Project.[4]   10/6/17 Wang Dep. Tr. 80–83; 12/5/17 Lyle Hosoda Dep. Tr. 14–15,
Dkt. No. 133-5; 12/15/17 Warren Price Dep. Tr. 17–20, Dkt. No. 133-6.   Wang
retained Price to represent the Sunday's Companies in connection with Irongate and
the Project units sometime in 2009.   12/15/17 Price Dep. Tr. 19–20.   Beginning in
early 2011, several of Price's clients, including Wang, attempted to close under their
original Sales Contracts, rather than attempt to recover their deposits in litigation.
12/15/17 Price Dep. Tr. 23–24.   Wang signed a Confidentiality Agreement and
reached out to negotiate directly with Irongate's principal, Jason Grosfeld, to
achieve an agreement regarding the Project units.   Irongate Ex. G (Confidentiality
Agreement), Dkt. No. 133-8; 10/6/17 Wang Dep. Tr. 67–68, 73, 103–105.   Wang

---

[4]Plaintiffs waived the attorney-client privilege with respect to communications that Wang had
with her attorneys before and at the time of signing the 2011 Agreement.   *See* 11/28/17 Order at 3,
7, 11, Dkt. No. 125 (granting in part and denying in part Irongate's Motion to Compel production
of documents and further testimony from Plaintiffs, finding that "the scope of the waiver is the
entirety of the communications regarding the 2011 settlement agreement," and ordering that
Irongate is "is entitled to discovery of *all* communications between Plaintiffs and Plaintiffs'
former counsel concerning the 2011 settlement agreement," including "'all written
communications (including emails, legal memoranda and other writings) between Plaintiffs, Ms.
Wang and their former counsel leading up to, following and concerning the meaning and intent of
the 2011 Settlement Agreement'").

met with Grosfeld in January 2011 at Irongate's offices in Los Angeles. 10/6/17 Wang Dep. Tr. 103–105.

By 2011, Wang did not have sufficient assets to pay cash for the four units because the value of her assets had decreased between 50 to 70% since the signing of the Sales Contracts. As a result, she intended to finance the remainder of the purchase. 10/6/17 Wang Dep. Tr. 46–47. During her meeting with Grosfeld, she says he told her that Irongate would not provide the financing that Plaintiffs needed. 10/6/17 Wang Dep. Tr. 105. Despite that, she never expressed to her counsel that she lacked the financial resources to close. 10/6/17 Wang Dep. Tr. 107.

On March 31, 2011, Grosfeld sent Wang an email with two possible options for closing on Plaintiffs' units: both offers were subject to an additional non-refundable down payment of 10% of the purchase price, a 30-day closing period, and a mutual release of all claims. Irongate Ex. H (3/31/11 Email); Dkt. No. 133-9. On April 6, 2011, Grosfeld followed up, sending an email to Wang, Hosoda, and Price, stating that "we must sign a deal very shortly or I will be forced to begin the steps toward default and termination of your contracts." Sunday's Companies' Ex. R (4/6/11 Email), Dkt. No. 162-18. Wang acknowledged that if no deal was made soon, Irongate would terminate the Sales Contracts and pursue remedies for default. 10/6/17 Wang Dep. Tr. 123–24.

Concerned that she would lose her original deposits of nearly $1.5 million (10/6/17 Wang Dep. Tr. 88), Wang sent Grosfeld a counteroffer by email on April 6, 2011 with four options. Among other things, her counter included asking for a "straightforward return" of the original deposits. It also proposed as an alternative "clos[ing] on two of my three studio units, and we can swap unit #3607 for the same size unit on floors 30–34 which I understand have an average sales price of $2.5M. And, swap one studio unit for a one bedroom suite which has an average sales price of $1.5M." Irongate Ex. I (4/6/11 Email), Dkt. No. 133-10. Grosfeld left a voicemail message for Wang on April 11, 2011, advising her that her fourth proposed option might work for Irongate, but that he needed to clarify some matters with her. Irongate Ex. K (4/11/11 Email), Dkt. No. 133-12.

On May 5, Grosfeld sent an email to Wang accepting option four subject to "(i) a non-refundable down payment of 10% of the purchase price upon signing of the definitive agreement; (ii) a 30 day close; the contract amendment will provide for an extended closing option for an additional 30 days for a fee of $1000 per day; and (iii) a mutual release of any and all claims." Irongate Ex. L (5/5/11 Email), Dkt. No. 133-13. The balance due at closing was $5,757,280 plus closing costs, and "must be a cash purchase or a purchase financed by an institution other than Beach Walk Mortgage LLC ("BWM"), [Irongate's] wholly owned mortgage company." *Id.* A closing agreement was attached to the email, to be signed by

8

May 9, 2011. Section 4 of the proposed agreement entitled "Extended Closing Date" provided that the purchaser "agrees to deposit into escrow an additional non-refundable payment" upon execution of the agreement. Grosfeld's email instructed: "if we don't hear from you or you reject this offer, we will begin the process of contract termination." *Id.* Wang received a revised agreement the next day from Price's office, correcting errors in the prior version of the agreement sent by Grosfeld. Irongate Ex. M (5/6/11 Email), Dkt. No. 133-14. Wang responded to Grosfeld on the May 9, 2011 deadline, asking to swap unit #3607 for a lower floor unit at a lower price. Irongate Ex. N (5/9/11 Email), Dkt. No. 133-15. Grosfeld responded to Wang by email that same day, agreeing to swap the unit and offering her several options, while informing her that his offer would expire on May 10, 2011. Irongate Ex. O (5/9/11 Email), Dkt. No. 133-16.

On May 10, at Wang's direction, Hosoda accepted Grosfeld's May 9 offer, and Price's office informed Grosfeld of the identity of the replacement unit to be swapped. Irongate Ex. P (5/10/11 Email), Dkt. No. 133-17. On May 11, Wang and Hosoda received the 2011 Agreement from Price for her signature, to be returned by May 12. Irongate Ex. Q (5/11/11 Email), Dkt. No. 133-18. The email from Price's office stated "As you can see from the Agreement, the additional funds are required at the same time," by the close of business on May 12, 2011. *Id.*

Wang executed the 2011 Agreement on May 12, but did not send the balance of funds due at that time. Irongate Ex. B, Dkt. No. 133-3.[5]

Instead, on May 12, Wang's assistant sent an email to Hosoda, indicating that she wished to amend the amount of additional payment due to $308,170.00, rather than $566,607.00. Irongate Ex. R (5/12/11 Email), Dkt. No. 133-19. Hosoda's office responded by email that same day, writing that $566,607.00 was due under Section 4 of the Agreement by the close of business, and informing Wang that her "failure to do so could jeopardize the settlement of this matter and subject you to significant exposure, the likes of which Lyle has explained to you in numerous prior discussions." Irongate Ex. R. Nonetheless, Irongate appeared willing to accept Wang's modified proposal, and requested Price's office to have her make an immediate payment towards the $308,170.00 as a sign of good-faith. Irongate Ex. S (5/12/11 Email), Dkt. No. 133-20. Wang, however, made only one payment of $50,000, on May 18, 2011, towards the $308,170.00. Irongate Ex. T (5/23/11 Email), Dkt. No. 133-21.

Under the May 2011 Agreement, the Sunday's Companies were to pay Irongate "additional non-refundable payment[s]" in order to secure an extended

---

[5]The Agreement was signed by Wang for the Sunday's Companies on May 12, 2011, and by Jason Grosfeld on behalf of Irongate on May 13, 2011.

closing for the units.[6]   If the Sunday's Companies were unable to timely close on

the units, under Section 4 of the Agreement, they would forfeit these additional

non-refundable payments and further "release all rights and claims pursuant to

[S]ection 8."   Section 8 of the Agreement reads:

> Purchaser's Release.    Each Releasor and each of such
> Releasor's members, successors, heirs, assigns, parents, owners,
> investors, managers, agents, officers, directors, employees,
> attorneys, lenders, insurers and affiliates (collectively,
> "Releasor") hereby releases Releasee and each of Releasee's
> members, successors, heirs, assigns, parents, owners, investors,

---

[6]Section 4 of the Agreement provides in full:

> Extended Closing Date.   Purchaser 2005 agrees to deposit into escrow an
> additional non-refundable payment of NINETY-EIGHT THOUSAND SEVEN
> HUNDRED NINETY AND NO/DOLLARS ($98,790.00) for Unit No. 2005,
> Purchaser 2205 agrees to deposit into escrow an additional non-refundable
> payment of ONE HUNDRED ONE THOUSAND SEVEN HUNDRED NINETY
> AND NO/DOLLARS ($101,790.00) for Unit No. 2205, Purchaser 2217 agrees to
> deposit into escrow an additional non-refundable payment of ONE HUNDRED
> SEVEN THOUSAND FIVE HUNDRED NINETY AND NO/DOLLARS
> ($107,590.00) for Unit No. 2217, and Purchaser 3607 agrees to deposit into escrow
> an additional non-refundable payment of TWO HUNDRED FIFTY EIGHT
> THOUSAND FIVE HUNDRED AND NO/DOLLARS ($258,500.00) for
> Substitute Unit No. 3208 upon execution of this Agreement, and all Purchasers
> shall make best efforts to close with cash no later than June 27, 2011, as scheduled
> by Seller in accordance with the terms of the Sales Contracts and this Agreement.
> Such additional non-refundable payments shall be applied to the Total Purchase
> Price at Closing of each respective unit.   Should Purchaser 2005, Purchaser 2205,
> Purchaser 2217 or Purchaser 3607 fail to close by June 27, 2011, such Purchaser
> has the right to one additional thirty (30) day-extension to close, July 27, 2011;
> provided, however, that such Purchaser agrees to pay a fee of $1,000.00
> ("Extension Fee") for each day of delay after June 27, 2011.   Such Extension Fee
> will not be applied to the Total Purchase Price at Closing of each respective unit.
> Should all Purchasers fail to close by June 27, 2011 or no later than thirty (30) days
> thereafter subject to the Extension Fee, all Purchasers will forfeit to Seller all
> additional non-refundable payments made pursuant to this section 4 and,
> furthermore, release all rights and claims pursuant to section 8.

managers, agents, officers, directors, employees, attorneys, lenders, insurers and affiliates (collectively, "Released Parties") from the claims made or asserted, or that could have been made or asserted, in the Litigation, including but not limited to claims for equitable and/or legal relief and including damages of any and all kind; provided, however, that this release does not include or release claims that Releasor may have arising (a) after the execution of this Agreement, (b) out of any design or construction defect claims, known or unknown, and (c) out of the contractual duties, rights or obligations of the Released Parties, if any, relating in any way to the (i) management and/or operation of the Front Desk Unit, (ii) the Home Owners Association ("HOA"), including without limitation any claims made by or on behalf of the HOA, and any claims made against the HOA, and/or (iii) the assignment or non-assignment of the Trump License to the HOA. In other words, upon the execution of this Agreement, this release is intended to forever release and waive any and all claims by the Releasor arising out of the purchase and sale of the Units and the Litigation, but is not intended to release, limit or impair in any respect Releasor's claims as owner of the Units existing after the execution this Agreement, subject to and limited only by the release described in this paragraph. To the extent Releasor is a party to the Litigation, Releasor also agrees to execute a stipulation for dismissal with prejudice of any and all claims that have been, or could have been, made or asserted in accordance with the terms of this release.

Irongate Ex. B (2011 Agreement), Dkt. No. 133-3. Section 12 of the Agreement states: "This Agreement supersedes, cancels and replaces all prior discussions or agreements to supplement or amend the Sales Contract, and the Sales Contract is in all respects enforceable according to its terms, except as modified herein." *Id*.

When the Sunday's Companies did not make the additional payments due under the Agreement, Hosoda and Price each communicated to Wang that Plaintiffs

were in breach of the Agreement she had just executed on May 12, and at risk of losing the units and all payments previously made to Irongate.   Irongate Ex. T (5/23/11 Email from Hosoda) ("My strong sense is that if you don't follow through with at least the $308,000 that you put yourself at serious risk of losing the purchases."); Irongate Ex. U (5/25/11 Email from Price), Dkt. No. 133-22 ("You defaulted when you failed to make the payment required in the 'Agreement' you entered with Irongate on May 12, 2011, copy attached.   Because of this default, you not only lost your right to purchase the units in Trump, but you also lost any claim for the return of your deposits on these units.").

Price secured a brief extension of time for the Sunday's Companies, until June 6, 2011 to perform under the Agreement by making the required additional non-refundable payments.   In a May 25, 2011 letter to Wang, Price explained to her: "Under the terms of this Agreement, you released Irongate from any claims on behalf of Your LLCs arising out of the Sales Contracts, or relating to the sale of these units, in exchange for various considerations from Irongate."   Irongate Ex. U (5/25/11 Letter attached to Email from Price).   The letter directs her to wire funds to Irongate and informs her of the consequences of further failure to comply with the Agreement:

> In an effort to give you one last chance not to lose your chance to buy these units, and not to lose your deposits, we have obtained an agreement from Irongate to give you an additional ten (10)

days to 'cure' your default in not making the above payments. This will require that you wire the above funds to the appropriate escrow accounts at Title Guaranty Escrow Services **no later than close of business Hawaii time on Monday, June 6, 2011**. If you do, the remainder of the provisions of the Agreement will remain in full force and effect.

Allowing you this period to 'cure' the breach of the Agreement that occurred on May 12, 2011, is a major concession by Irongate. Irongate has made clear, however, that there will be no more time given, and this will mean that if this money is not received in time, not only will you lose the right to purchase these units, but you will lose the deposits paid on these units by Your LLCs that were quite substantial. Accordingly, we cannot emphasize enough how important it is for you to 'cure' this breach of the Agreement so we can move forward.

*Id.* On May 31, when Plaintiffs did not make any additional payments, Irongate notified them that they were in default and allowed an additional twenty-day period of time to cure. This further extension, however, had no effect. The Sunday's Companies again failed to remedy the default, and Irongate sent a notice of termination on June 23, 2011. Irongate Ex. K to Counterclaim MSJ (6/27/11 Notice of Termination), Dkt. No. 135-12. Irongate declared Plaintiffs in default under Section D.37 of the Sales Contracts and refused to return any of the $1,439,320.00 in original deposits, relying on Section 8 of the 2011 Agreement. *Id.*

On July 22, 2011, Plaintiffs' current counsel, J. Patrick Fleming, sent a letter to Irongate demanding the return of the original deposits paid under the Sales Contracts totaling $1,439,320.00, and the additional $50,000.00 paid into escrow

under the 2011 Agreement.   Irongate Ex. V (7/22/11 Demand Letter), Dkt. No.

133-23.   According to the Sunday's Companies, the 2011 Agreement did not

modify the Sales Contracts, including Irongate's obligation to return any deposits

exceeding fifteen percent of the sales price in the event of termination.

## II.    Procedural Background

Plaintiffs' filed their original complaint in 2013.   In a February 4, 2014

Order, the Court granted Irongate's motion to dismiss, finding that, because the

claims asserted in this action arise out of the purchase and sale of the units, the

Sunday's Companies waived and released their deposit and escrow claims when

they entered into the 2011 Agreement.   *See* Dkt. No. 22 (2/4/14 Order).   In a

November 15, 2016 memorandum disposition, the Ninth Circuit reversed the

Court's February 4, 2014 Order, concluding instead that the 2011 Agreement's

release terms were ambiguous, and remanded for further proceedings.   *See*

*Sunday's Child, LLC v. Irongate AZREP BW LLC*, 666 F. App'x 587 (9th Cir.

2016).[7]

---

[7]The Ninth Circuit's November 15, 2016 ruling left untouched the Court's dismissal of Plaintiffs'
Count IV (tortious breach of contract), Count VI (punitive damages), and Count VII (breach of the
implied covenant of good faith and fair dealing) claims.   In a February 10, 2017 Order, the Court
denied Irongate's motion to dismiss Plaintiffs' Count III (conversion) and Count V (unjust
enrichment) claims.   Dkt. No. 73 (2/10/17 Order).   Plaintiffs filed a First Amended Complaint on
November 2, 2017, alleging breach of contract (Count I), seeking declaratory relief (Count II),
conversion (Count III), and unjust enrichment (Count IV).   Dkt. No. 121.   Irongate filed a
Counterclaim for breach of contract and declaratory relief on February 24, 2017, asserting that
Plaintiffs breached the 2011 Agreement.   Dkt. No. 74-1.

The Ninth Circuit's November 15, 2016 decision explained that relevant portions of the 2011 Agreement were ambiguous, including "Section 8(a) of the Settlement Agreement preserving claims arising 'after the execution of [the 2011] Agreement.' Here, Sunday's Child's claims arose after the signing of the Settlement Agreement: Sunday's Child failed to make its required payments under the Agreement after it was signed, Irongate decided to declare Sunday's Child in default before the purchase and sale were complete, and Irongate then refused to return any portion of the deposits." 666 F. App'x at 589. The relevant portion of Section 8 is ambiguous because it declares—

> the Agreement "is intended to forever release and waive any and all claims by [Sunday's Child] arising out of the purchase and sale of the Units **and** the Litigation." The use of the conjunctive here makes it possible to interpret this phrase in its entirety as releasing claims relating to the purchase and sale which were set forth, or which could have been set forth, **in the Litigation**. The claims at issue here, although they relate in a general sense to the purchase and sale of the condominium units, post-date the Litigation and the signing of the Settlement Agreement. Per Section 8(a), Sunday's Child may not have released its right to seek a partial refund of deposits—or to raise related claims—based on events arising "after the execution of [the Settlement] Agreement."

666 F. App'x at 590.

The Ninth Circuit's decision also addressed the relationship between Sections 4 and 8 of the 2011 Agreement, with respect to Irongate's argument that Section 4 modified the 2006 Sales Contracts, notably Section D.37, such that Irongate was

allowed to keep all deposits made, no longer requiring it to refund deposit monies remaining after subtracting 15% of the purchase price.   The Ninth Circuit panel found Section 4 ambiguous as to whether it "changed Section D.37 of the Sales Contracts, allowing Irongate to keep all deposits ever made by Sunday's Child." *Id.* at 591.   "Section 4 required Sunday's Child to make new payments, which would be forfeited if Sunday's Child did not close on the property by the agreed upon date.   Section 4, however, said nothing about the original deposit made in 2006 pursuant to Section D.37 of the Sales Contracts.   Furthermore, Section 4 only requires forfeiture of 'additional' payments. . . . Under this interpretation, the payments that are forfeited could be the additional payments (made pursuant to the Settlement Agreement), but might not include the original deposit (made in 2006)." *Id.* at 591.   In light of these ambiguities, the parties conducted discovery regarding their intent and understanding of material terms in the 2011 Agreement.

Presently before the Court are two Motions for Summary Judgment filed by Irongate (1) on all remaining claims in Plaintiffs' First Amended Complaint (Dkt. No. 132) and (2) on its Counterclaim for Plaintiffs' breach of contract for failure to make the additional nonrefundable payment (Dkt. No. 134).   Irongate summarizes its argument on Plaintiffs' claims as follows:

> The evidence now before the Court conclusively establishes that
> there is no ambiguity in the May 2011 Closing and Settlement
> Agreement in that: (1) if Plaintiffs failed to close, Plaintiffs

would lose all payments made by them under the Agreement; (2) the May 2011 Closing and Settlement Agreement contained no liquidated damages limitation or other restriction limiting Irongate to 15% of all payments; (3) Plaintiffs waived and released all claims under the 2006 Sales Contracts; and (4) Plaintiffs' sole representative, Ingrid Wang, never read — or read only limited portions of — the May 2011 Closing and Settlement Agreement and relied entirely on her former counsel, Messrs. Price and Hosoda, concerning the meaning and interpretation of the May 2011 Closing and Settlement Agreement. Therefore, Plaintiffs are legally bound by former counsels' understanding of that Agreement.

Mot. for Summ. J. at 4, Dkt. No. 132.

In its motion for summary judgment on its Counterclaim for breach of contract, Irongate "requests that the Court find that, pursuant to Section 4 of the May 2011 Closing and Settlement Agreement, Sundays was required to pay Irongate $566,607.00 as an 'additional nonrefundable payment' toward closing. It is undisputed that Sundays only paid $50,000, and thus owes Irongate an additional $516,607.00." Mot. for Summ. J. on Counterclaim at 2, Dkt. No. 134.

In addition to summary judgment, Irongate seeks sanctions under Federal Rule of Civil Procedure 11 and the Court's inherent authority against Plaintiffs' counsel, J. Patrick Fleming, Esq., and Plaintiffs' sole member, Wang. Sanctions Mot., Dkt. No. 202.

# DISCUSSION

Irongate meets its summary judgment burden both as to Plaintiffs' claims for the return of the original deposits and on its own Counterclaim for breach of the 2011 Agreement. First, the record demonstrates that all parties intended the 2011 Agreement to waive and release all claims relating to the Sunday's Companies' recovery of their original deposits. Second, Plaintiffs breached the 2011 Agreement when they failed to make the additional non-refundable payments necessary to close on the four units. Finally, because Plaintiffs' counsel, J. Patrick Fleming, Esq., and Wang knew or reasonably should have known at all relevant times that Plaintiffs' claims were factually and legally baseless in light of the intent of the parties with respect to the material terms of the 2011 Agreement—yet continued to advocate for a contrary meaning even after the Ninth Circuit determined that the terms were ambiguous and that the parties' intent would control—the Court grants in part Irongate's Motion for Sanctions.

## I.   Irongate Is Entitled to Summary Judgment on Plaintiffs' Claims

Because Plaintiffs' claims for breach of contract and related declaratory relief (Counts I and II), conversion (Count III), and unjust enrichment (Count IV) all turn on the meaning of the Agreement,[8] the Court first addresses the intent of the parties

---

[8]Plaintiffs seek the return of "excess" deposits based on breach of contract, conversion and unjust enrichment, FAC ¶¶ 17(d), 18, 19, thus, under any theory of liability, the Court must resolve

to determine the meaning of portions of the Agreement previously identified as ambiguous by the Ninth Circuit. The evidence before the Court now reveals that during the course of negotiating the 2011 Agreement and its extensions, both Price and Hosoda, Wang's attorneys, intended and understood that the Agreement released all claims that the Sunday's Companies had to recover any of their deposits, including the original deposits under the 2006 Sales Contracts, in exchange for curing their default, allowing additional time to close, swapping the units to be purchased, and applying the 2006 deposits to the modified transaction. The evidence is equally clear that no one associated with the Agreement's negotiations had any contrary understanding. Accordingly, pursuant to Federal Rule of Civil Procedure 56(a), the Court grants Irongate's Motion for Summary Judgment on Plaintiffs' First Amended Complaint. Dkt. No. 132.

A. **Legal Framework**

In light of the Ninth Circuit's determination that relevant provisions of the 2011 Agreement are ambiguous as a matter of law, the Court may resolve the ambiguity by examining extrinsic evidence to explain the intent or understanding of the parties and the circumstances under which the Agreement was executed. *See Found. Int'l, Inc. v. E.T. Ige Const., Inc*., 102 Hawaiʻi 487, 496, 78 P.3d 23, 32

---

whether Plaintiffs released their right to bring claims for the return of their original deposits under the 2011 Agreement.

(2003) ("Generally, the determination of whether a contract is ambiguous is also a question of law."); *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Hawai'i 36, 45–46, 305 P.3d 452, 461–62 (2013) (The parol evidence rule "permit[s] the court to consider extrinsic evidence when the writing in question is ambiguous or incomplete.  Where there is any doubt or controversy as to the meaning of the language, the court is permitted to consider parol evidence to explain the intent of the parties and the circumstances under which the agreement was executed.") (quoting *Hokama v. Relinc Corp.*, 57 Haw. 470, 476, 559 P.2d 279, 283 (1977)) (other citations omitted); *see also Stewart v. Brennan*, 7 Haw.App. 136, 143, 748 P.2d 816, 821 (1988) (when the meaning of specific contractual terms is unclear, a court may consider extrinsic evidence, such as evidence of surrounding circumstances and the subsequent acts and conduct of the parties); *Am. Auto. Ins. Co. v. Hawaii Nut & Bolt, Inc.*, Civ. No. 15-00245 ACK-KSC, 2017 WL 5895162, at *7 (D. Haw. June 27, 2017) (citation omitted) ("Hawaii also allows consideration of extrinsic evidence to explain the intent of the parties and circumstances under which the agreement was executed if there is doubt as to the agreement's meaning.") (citation and internal quotation marks omitted).

Where, as here, "an ambiguity exists in [the Agreement], its proper means of construction remains to be determined as a matter of law[,]" by examining "extrinsic evidence, *i.e.*, all evidence outside of the writing including parol evidence, . . . to

determine the true intent of the parties if there is any doubt or controversy as to the meaning of the language embodying their bargain." *Hokama*, 57 Haw. at 475–76, 559 P.2d at 283.

> Therefore, it is invariably necessary before a court can give any meaning to the words of a contract and can select one meaning rather than other possible ones as the basis for the determination of rights and other legal effects, that *extrinsic evidence shall be heard to make the court aware of the "surrounding circumstances,"* including the persons, objects, and events to which the words can be applied and which caused the words to be used.

*Hokama*, 57 Haw. at 475, 559 P.2d at 283 (quoting 3 Corbin, Contract § 536, 27–28).

The Court turns to consideration of the entire record, including extrinsic evidence, in order to determine the intent of the parties and resolve the ambiguities in the Agreement identified by the Ninth Circuit in its November 15, 2016 decision.

### B.     Irongate Is Entitled To Summary Judgment

The evidence, briefly summarized, demonstrates that: (1) Wang either did not read the 2011 Agreement or read only parts of it; (2) even if she read it, Wang testified at deposition that she had no understanding of the Agreement's terms beyond the understanding of her counsel, Price and Hosoda; (3) Price and Hosoda advised Wang, contemporaneous with the Agreement, on multiple occasions, both orally and in writing, that the Sunday's Companies would forfeit *all* of their

deposits, including those made in 2006, if they did not timely close under the 2011

Agreement; (4) The Sunday's Companies did not timely close under the 2011

Agreement; and (5) Price and Hosoda confirmed in writing to Wang

contemporaneous with the 2011 Agreement that the Agreement released the

Sunday's Companies' *claims* to deposits under the 2006 Sales Contracts,

correspondence that pre-dated the filing of the instant action.   These facts doom

Plaintiffs' claims.

Because the Sunday's Companies, through their sole owner and member

Wang, have no independent recall or understanding of the terms or content of the

2011 Agreement, *see* 10/7/17 Wang Dep. Tr. 210–16, Dkt. No. 171-4, the Court

looks to the evidence of surrounding circumstances, including the knowledge and

intent of Price and Hosoda, the attorneys who advised Wang regarding the meaning

and understanding of those terms.   *See Alt v. Krueger*, 4 Haw. App. 201, 207, 663

P.2d 1078, 1082 (1983) ("the attorney-client relationship is that of principal and

agent, and the client is bound by the acts of his attorney within the scope of the

latter's authority") (citations omitted); *Ranieri v. Kersenbrock*, No. CIV. 10-00295

JMS, 2011 WL 5520609, at *9 (D. Haw. Nov. 14, 2011) ("the knowledge of an

individual's attorney (Marshall) is imputed to his clients (Plaintiffs)") (citing

*Medeiros v. Udell*, 34 Haw. 632, 1938 WL 6814, at *2 (Haw. Terr. 1938)

("Knowledge on the part of an attorney is imputable to his client."); *Immunocept,*

*LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1287 (Fed. Cir. 2007)

("Knowledge or notice to an attorney acquired during the existence of the

relationship of attorney and client, and while acting within the scope of his authority,

is imputed to the client." (citation and quotation signals omitted)); *Veal v. Geraci*, 23

F.3d 722, 725 (2d Cir. 1994) ("'[A client] has notice of a fact if his [attorney] has

knowledge of the fact, reason to know it or should know it, or has been given a

notification of it.'" (quoting Restatement (Second) of Agency § 9(3) (1958)); and

*Levin v. Berley*, 728 F.2d 551, 553 (1st Cir. 1984) ("Levin denies knowledge of this

letter, but a client is charged with the knowledge of his attorney.")).[9]  The Sunday

Companies may not shield themselves from the facts known to their attorneys, or

from their attorneys' clear understanding of the material terms of the 2011

Agreement—especially in light of the unrefuted record in this case, demonstrating

---

[9]*See also Stonebrae L.P. v. Toll Bros.*, 521 F. App'x 592, 594 (9th Cir. 2013) (The "district court
appropriately resolved any ambiguity [in a Fed. R. Civ. P. 68 offer] by considering extrinsic
evidence.   All of the relevant extrinsic evidence, including unchallenged in-court statements by
[appellant's] attorney, confirmed" the district court's finding.); *Ovchinnikov v. Contech Const.
Prod., Inc.*, 364 F. App'x 351, 352 (9th Cir. 2010) (Plaintiff's "argument that he did not
understand that the terms 'full release' of 'all claims' meant *all* his claims against [defendant] is
without merit," because plaintiff's counsel's "statements and actions objectively indicate that
[plaintiff]'s counsel understood what [defendant] meant by 'full release of all claims.'   Because
[plaintiff]'s counsel had apparent authority to agree to a binding settlement on [plaintiff]'s behalf,
counsel's understanding of the term was sufficient to form a contract.") (citation omitted).

that Price and Hosoda explained their understanding of these terms to Wang and did so in 2011.[10]

First, Section 8 of the 2011 Agreement releases the Sunday's Companies' claims "made or asserted, or that could have been made or asserted, in the Litigation," which Price explained were the claims to recover initial deposits asserted in the Buyers' Suits.   *See* 1/15/18 Price Dep. Tr. 159–160, Dkt. No. 171-5. ("Litigation is our case against Irongate and their case—from paragraph eight, it was our claim against Irongate.   The only claim was to get our deposits back."). Price's uncontroverted testimony establishes that the entire purpose of the Buyers' Suits was for those plaintiff purchasers to recover their original deposits.   1/15/18 Price Dep. Tr. 13–14.   And claims to such deposits were precisely what the

---

[10]The Restatement (Third) of Agency explains that the doctrine of imputation from agent to principal encourages dealings that more fully reflect material facts—

> If a principal may use an agent as a shield by claiming ignorance of facts known to the agent that are relevant to the terms of a transaction with a third party, the terms of the transaction to which the principal and the third party agree may differ from the terms to which they would have agreed were the principal not shielded from the agent's knowledge.   By treating the principal as knowing material facts known to the agent, imputation encourages dealings that more fully reflect material facts. Imputation may also encourage a principal to direct its agent to reveal material facts to it because knowledge of these facts enables the principal to make an informed decision how to proceed.   The principal may, for example, decide to abandon a transaction that has not yet been consummated, or to bargain for a lower price or for other terms that reflect the economic significance of the facts.

Restatement (Third) Of Agency § 5.03 cmt. b. (2006); *see also id.* cmt. d.(1). (noting that "facts known to a contracting party may be relevant to interpreting terms in the contract, may establish defenses to duties of performance, and may provide grounds on which the contract may be rescinded").

Sunday's Companies were relinquishing by virtue of their entering into the 2011

Agreement.   1/15/18 Price Dep. Tr. 160.

Price elaborated further:

> When [Wang] signed the — the [2011] agreement and went
> down the path of closing, she released her claims for her deposits
> because keeping that claim alive and closing were mutually
> exclusive.   And she had released that now.   So, whatever
> chance we would have had in the original case to recover any of
> that, that was erased by her decision to settle and agree, going
> forward, that she had no claim for her deposits.   But she got
> credit for her deposits in her agreement with Irongate, and we
> made sure of that.

12/15/17 Price Dep. Tr. 60.   Price also testified that "because [Wang] is now going

to actually buy the units [following execution of the 2011 Agreement], she's giving

up her claim to get her deposits back in exchange for the fact that her deposits are

credited against her purchase of those units."   12/15/17 Price Dep. Tr. 71.

Although the Sunday's Companies released their claims against Irongate related to

the purchase of the units, including claims related to the right to recover deposits,

they retained the right to bring any claims related to their status as owners of the

units.   Price clarified the specific ambiguity identified by the Ninth Circuit during

his deposition:

> Q:   So whether you read ["]purchase and sale of the [U]nits["]
> separately or conjunctively with the [L]itigation, is it clear
> to you that release encompassed any rights [Plaintiffs] had
> under the purchase agreement as the purchaser —

A.    Yes.

1/15/18 Price Dep. Tr. 161.

Second, Price's testimony also establishes that the parties intended that the

2011 Agreement modify the 2006 Sales Contracts, in particular, Section D.37, and

therefore, by executing the 2011 Agreement, Plaintiffs forfeited their original

deposits made under the 2006 Sales Contracts.   Price explained:

> A:    With this agreement, generally—and I can't speak about other agreements with other clients — I made sure that the specific performance claim was released by Irongate.  I made sure that the client's deposits were all fully credited towards the purchase price.
>
> ****
>
> Claims [Irongate] had under the sales agreement, which was specific performance.  [Section] D.37, they could try and get their liquidated damages.  They could also try to get specific performance.  In Mrs. Wang's case, they could try and sue her, force her to close on the four units that she had originally signed up for, for full price.   I saw that as a very big potential downside to Mrs. Wang, and I made sure that that was released in this document.
>
> ****
>
> D.37 is not a basis to make a claim.   D.37 is the seller's remedy upon the default of the buyer.  Okay? Once she defaults, the remedies are liquidated damages or specific performance.   That, that was superseded by all of this because — and this made sure that they would never be able to come back and sue her for specific performance.   She was releasing her claims against them for deposits.   We made sure that they released their claims against her for specific performance, and this covers it.

1/15/18 Price Dep. Tr. 130–33. Hosoda's testimony was no different: he did not

consider the 2011 Agreement's terms to be ambiguous, and he understood that the

Sunday's Companies released claims to *all* deposits through that Agreement.

12/5/17 Hosoda Dep. Tr. 59–60, 63.

Price and Hosoda's testimony is confirmed by multiple communications sent

to Wang before and after she executed the 2011 Agreement. *See* Irongate Ex. Y

(2/22/11 Price Email to Wang), Dkt. No. 180; Ex. Z (2/28/11 Hosoda Letter), Dkt.

No. 181); Ex. EE (4/8/11 Price Email and Memorandum), Dkt. No. 182; Irongate

Ex. R (5/12/11 Email), Dkt. No. 133-19. Most significantly, on May 25, 2011,

Price clearly told her: "Under the terms of this Agreement, you released Irongate

from any claims on behalf of Your LLCs arising out of the Sales Contracts, or

relating to the sale of these units, in exchange for various considerations from

Irongate." Irongate Ex. U (5/25/11 Letter attached to Email from Price). The

letter directs her to wire funds to Irongate and informs her of the consequences of

further failure to comply with the Agreement:

> In an effort to give you one last chance *not to lose your chance to
> buy these units, and not to lose your deposits*, we have obtained
> an agreement from Irongate to give you an additional ten (10)
> days to 'cure' your default in not making the above payments.
>
> ****

Allowing you this period to 'cure' the breach of the Agreement that occurred on May 12, 2011, is a major concession by Irongate. Irongate has made clear, however, that there will be no more time given, and this will mean that if this money is not received in time, *not only will you lose the right to purchase these units, but you will lose the deposits paid on these units by Your LLCs that were quite substantial*. Accordingly, we cannot emphasize enough how important it is for you to 'cure' this breach of the Agreement so we can move forward.

*Id.* (emphasis added); *see also id.* (5/25/11 Email from Price) ("You defaulted when you failed to make the payment required in the 'Agreement' you entered with Irongate on May 12, 2011, copy attached. Because of this default, you not only lost your right to purchase the units in Trump, but *you also lost any claim for the return of your deposits on these units*.") (emphasis added).

Hosoda, moreover, testified that Wang understood the terms of the 2011 Agreement and the consequences of her failure to cure following receipt of that May 25 letter from Price:

> Q: This is the May 25, 2011, letter from [Price] that you had reviewed with [Wang]. And I'm asking you to look at this because it's really a follow-on in the questions that were just asked you about what did you tell her and how did you read things? . . . . "Under the terms of this agreement, you released Irongate from any claims on behalf of your LLCs arising out of the sales contracts or relating to the sale of these units in exchange for various considerations from Irongate." It goes on. Is it your recollection that this is essentially what you told her before she signed as far as one of the material terms?
>
> A: In general.

****

> A. She was informed of the consequences if she did not follow through pursuant to the terms of this agreement. And the biggest one -- and why all the scurrying around was happening -- was the forfeiture and the loss of her deposits.

12/5/17 Hosoda Dep. Tr. 93–95.

In short, the Sunday's Companies, based upon these unequivocal communications to Wang, knew or should have known what their attorneys clearly knew: that the 2011 Agreement waived and released any claims against Irongate for the return of the original deposits made by the Sunday's Companies in 2006. Plaintiffs' arguments to the contrary are not only unpersuasive but are disingenuous—both Price and Hosoda's litigation testimony is amply corroborated by their contemporaneous communications with Wang—and Wang's testimony creates no question of fact for purposes of determining the parties' intent and understanding of the ambiguous terms of the 2011 Agreement.

Likewise, Irongate understood and intended that by executing the 2011 Agreement, Plaintiffs were releasing all claims related to the purchase of the units, and in the event of forfeiture, would lose all deposits made. *See* 1/19/18 Federman Dep. Tr. 60–61, Dkt. No. 171-7 ("[D]eposits that were originally [made] under the [Sales Contracts] are used towards closing under this new structure, and these

purchasers would have rights as owners only going forward. But there was a release and a waiver of all previous purchaser rights, including deposits."). In light of the totality of the evidence before the Court, Plaintiffs "knew or reasonably should have known that the other party construed the term in a particular fashion, [therefore] that interpretation will control." *Found. Int'l, Inc. v. E.T. Ige Const., Inc.,* 102 Hawai'i 487, 497–98, 78 P.3d 23, 33–34 (2003) (footnoted omitted) (citing Restatement (Second) of Contracts § 201(2) (1979); *Harris Corp. v. Giesting & Assocs., Inc.*, 297 F.3d 1270, 1273 (11th Cir. 2002) (noting that a " party who willingly and without protest enters into a contract with knowledge of the other party's interpretation is bound by such interpretation and cannot later claim that it thought something else was meant") (internal quotation marks and citations omitted)). *Cf. State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Hawai'i 315, 325, 978 P.2d 753, 763 (1999) (holding that, "where the party seeking relief was not mistaken but consciously ignored the fact that he or she had limited knowledge of the facts, he or she effectively bears the risk of that mistake") (citations omitted).

In view of the entire summary judgment record, the Court determines the parties' understanding of the material terms and resolves as a matter of law the ambiguities identified by the Ninth Circuit in its November 15, 2016 decision: the 2011 Agreement released any claims relating to the Sunday's Companies' original deposits, including the claims made in this action. Because Plaintiffs released such

claims, Irongate is entitled to summary judgment on all of the causes of action raised in the FAC seeking the return of the original deposits.

## II.    <u>Irongate Is Entitled to Summary Judgment on Its Counterclaim</u>

Irongate seeks summary judgment on its Counterclaim that the Sunday's Companies breached Section 4 of the 2011 Agreement when they did not make the additional non-refundable payments required to close on the four units.   Irongate has established the elements of its breach of contract Counterclaim.   That is, there is no dispute that Irongate performed its obligations under the 2011 Agreement, and the Sunday's Companies did not.[11]   The Sunday's Companies "acknowledge that they did not pay all the non-refundable payments upon execution of the Agreement, and so were in default."   Mem. in Opp'n at 9, Dkt. No. 164.   More specifically, the Sunday's Companies only paid $50,000 of the $566,670 in mandatory non-refundable payments contemplated by the 2011 Agreement, and failed to close on the four units.   *See also* Pls.' Answer ¶¶ 6–7, Dkt. No. 120.   Nonetheless, Plaintiffs argue that summary judgment should be denied on Irongate's

---

[11]Under Hawaii law, to prevail on a claim for breach of contract, a party must prove: "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by Defendants; and (5) when and how Defendants allegedly breached the contract."   *Evergreen Eng'g, Inc. v. Green Energy Team LLC*, 884 F. Supp. 2d 1049, 1059 (D. Haw. 2012) (citations omitted).

Counterclaim based on the affirmative defenses of unjust enrichment,

unconscionability, unclean hands, and duress. The Court disagrees.[12]

First, the Court rejects the Sunday's Companies' attempt to invoke unjust

enrichment as an *affirmative defense*—without citation to any legal

authority—where, as here, there are adequate remedies at law. *Bill Darrah*

*Builders, Inc. v. Hall at Makena Place, LLC*, CV No. 15-00518 JMS-KSC, 2018 WL

650195, at *7 (D. Haw. Jan. 31, 2018) ("[W]here the parties to a contract have

bargained for a particular set of rights and obligations, all claims involving those

express rights and obligations properly lie in contract law and not in equity.

[E]quitable remedies are not available when an express contract exists between the

parties concerning the same subject matter[.]") (citations and internal quotation

marks omitted); *Soule v. Hilton Worldwide, Inc*., 1 F. Supp. 3d 1084, 1103 (D. Haw.

2014) ("Hawaii law makes clear that the absence of an adequate remedy at law is a

necessary prerequisite to maintaining an unjust enrichment claim.") (citing *Davis v.*

*Four Seasons Hotel Ltd*., CV No. 08–00525 HG–BMK, 2011 WL 5025521 at *6 (D.

---

[12]The Court also rejects the Sunday's Companies' argument that Irongate's election of remedies bars the relief it seeks by its Counterclaim Motion for Summary Judgment. As detailed in the preceding section, based upon the parties' understanding of Sections 4 and 8 of the Agreement, which released certain claims, Irongate was not required to elect a remedy under D.37, as Plaintiffs argue, to either sue for specific performance or terminate the Sales Contracts and retain the original deposits. *See* Mem. in Opp'n at 14–15. Section 4 unambiguously requires the payment of additional non-refundable payments and is not contingent upon D.37 or an order of specific performance.

Haw. Oct. 20, 2011 and *Porter v. Hu*, 116 Hawai'i 42, 169 P.3d 994, 1007 (2007)).

Because the parties' rights and obligations are established by the 2011 Agreement, all claims involving those express rights and obligations properly lie in contract law.

Second, neither the facts nor the law support Plaintiffs' duress defense.[13] The Sunday's Companies attempt to demonstrate that Irongate used an "improper threat that left [them] with no reasonable alternative but to agree to the contract." Mem. in Opp'n at 17 (citing Hawaii Civil Jury Instruction 15.25). They assert that Wang was under duress during the negotiations with Irongate because of its "sudden demands to close within a short time, and its threats to terminate the sales contracts and retain all deposit monies." *Id.* at 18 (citing Wang Dep. Tr. 266–69). According to the Sunday's Companies, Price's harsh words to Wang during a conference call that included Hosoda, "led her to believe she had no alternative but to sign the Agreement."[14] *Id.* Because Wang was represented by counsel at all

---

[13]Under Hawaii law, "an agreement is voidable due to duress when 'a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative.'" *Balogh v. Balogh*, 134 Hawai'i 29, 44, 332 P.3d 631, 646 (2014) (quoting *Standard Fin. Co., Ltd. v. Ellis*, 3 Haw.App. 614, 621, 657 P.2d 1056, 1061 (1983)); Restatement (Second) of Contracts § 175(1) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.").

[14]According to Wang, "a day or two before [she] signed the [A]greement," she spoke on the phone with Price and Hosoda. 10/6/17 Wang Dep. Tr. 62. She described the call as "a very short yelling match where Warren Price threatened, bullied, intimidated me on the pho – conference call and hung up on me and told me, 'Fucking sign the agreement or else.'" 10/6/17 Wang Dep. Tr. 61. Wang further explained her state of mind as follows:

times and did have alternatives—for example, she could have closed at full price under the 2006 Sales Contracts, proceeded with claims against Irongate in the Buyers' Suits or other litigation, or continued to negotiate with Irongate—she fails to show that she was under duress due to "pressure tactics" or demands by Irongate. Further, Irongate's threats to terminate and retain deposits under the terms of the 2006 Sales Contracts do not amount to duress in that it had the legal right to make such demands. *See Balogh v. Balogh*, 134 Hawaiʻi 29, 44, 332 P.3d 631, 646 (2014) (citing *Kam Chin Chun Ming v. Kam Hee Ho*, 45 Haw. 521, 558, 371 P.2d 379, 402 (1962) (it is not duress for a party to "threaten to do what they had a legal right to do"); *Autin v. Autin*, 617 So.2d 229, 233 (La. Ct. App. 1993) (holding that "a threat of doing a lawful act or a threat of exercising a right does not constitute duress")).

---

Shocking and being pushed against the wall. And I asked myself, what am I going to do, you know? I'm damned if I do and damned if I don't because I don't want to lose the [$]1.5 that I have already put down for these units, but I don't know what to do. How -- where do I turn?

Sign -- I -- "sign the thing or else you're going to be terminated" is what -- Warren Price's threats to me that last time that we were on the phone.

10/6/17 Wang Dep. Tr. 61. Price denies making these statements. In any event, Wang does not appear to assert that Irongate is chargeable with any duress caused by her own attorney, and even if she did, such sources of professed duress are not recognized by Hawaii law. *See, e.g., Balogh*, 134 Hawaii at 44 (duress must derive from an "improper threat *by the other party*") (emphasis added).

Third, the Court rejects Plaintiffs' unconscionability[15] and unclean hands

defenses.  The Sunday's Companies argue that Irongate used the threat of

termination and retention of the original deposits to pressure Wang into entering a

one-sided and inequitable agreement, which was substantively and procedurally

unconscionable.  The record demonstrates neither.  Wang was personally involved

in the negotiations with Grosfeld beginning in January 2011 and culminating in May

2011, advised by counsel throughout the process, and swapped units and changed

the amount of the additional non-refundable payments up until the moment of

execution.  None of this evidences procedural unconscionability.[16]  *See* Irongate

---

[15]Under Hawai'i law, unconscionability is recognized as a "general contract defense"—

> Unconscionability has generally been recognized to include an absence of
> meaningful choice on the part of one of the parties together with contract terms
> which are unreasonably favorable to the other party.  Whether a meaningful choice
> is present in a particular case can only be determined by consideration of all the
> circumstances surrounding the transaction.

*Narayan v. The Ritz-Carlton Dev. Co., Inc*., 140 Hawai'i 343, 350, 400 P.3d 544, 551 (2017)
(quoting *City & Cty. of Honolulu v. Midkiff*, 62 Haw. 411, 418, 616 P.2d 213, 218 (1980) (some
citations omitted); *see also Lewis v. Lewis*, 69 Haw. 497, 501, 748 P.2d 1362, 1366 (1988) ("The
basic test is whether . . . the clauses involved are so one-sided as to be unconscionable under the
circumstances existing at the time of the making of the contract. . . . The principle is one of the
prevention of oppression and unfair surprise[.]").   "A determination of unconscionability requires
a showing that the contract was *both* procedurally and substantively unconscionable."  *Balogh*,
134 Hawai'i at 41, 332 P.3d at 643 (2014) (emphasis added) (internal quotations, alterations, and
citation omitted).

[16]"Procedural unconscionability 'requires an examination of the contract formation process and
the alleged lack of meaningful choice.'"  *Narayan*, 140 Hawai'i at 351, 400 P.3d at 552 (quoting
*Gillman v. Chase Manhattan Bank, N.A*., 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828
(1988)).  Courts consider such factors as "whether deceptive or high-pressured tactics were
employed, the use of fine print in the contract, the experience and education of the party claiming

Ex. A (4/1/11 Email from Wang), Dkt. No. 176; Ex. B (4/8/11 Price Memorandum), Dkt. No. 177; Ex. C (4/6/11 Hosoda Email), Dkt. No. 178; Ex. N (5/9/11 Email from Wang), Dkt. No. 133-15. Nor have Plaintiffs established that any aspect of the 2011 Agreement was substantively unconscionable. "Substantive unconscionability focuses on the one-sidedness of the agreement," yet Plaintiffs identify no terms in the 2011 Agreement that were oppressive or even unreasonably favorable to Irongate, under the circumstances and specific course of dealing between the parties. *Narayan v. The Ritz-Carlton Dev. Co., Inc*., 140 Hawai'i 343, 352, 400 P.3d 544, 553 (2017). Finally, the Sunday's Companies do not identify any conduct *by Irongate* to justify the defense of unclean hands, which "will not allow a party to profit by his own misconduct." *Shinn v. Edwin Yee, Ltd*., 57 Haw. 215, 231, 553 P.2d 733, 744 (1976); *see also 7's Enters., Inc. v. Del Rosario*, 111 Hawai'i 484, 495, 143 P.3d 23, 34 (2006) (affirming denial of equitable relief under the "unclean hands" doctrine where party invoking the doctrine "knew about the covenant at the time she signed the Agreement[,] [t]here is no evidence that Plaintiff unfairly imposed such provision upon her [and] Defendant never contended that [Plaintiff's conduct] caused her to breach the covenant"). In short, neither

---

unconscionability, and whether there was disparity in bargaining power between the parties."
*Narayan*, 140 Hawai'i at 351, 400 P.3d at 552 (citations and quotation marks omitted).

unconscionability nor unclean hands applies under the particular facts and
circumstances of this matter.

Under the 2011 Agreement, the Sunday's Companies were obligated to make
additional non-refundable payments and close by a certain date and are in breach of
these requirements.   Accordingly, the Court grants Irongate's Motion for Summary
Judgment on its Counterclaim for breach of contract.

## III.   Irongate's Motion for Sanctions Is Granted in Part

Irongate seeks the following sanctions against Fleming, Sunday's
Companies' counsel, and Wang, under Rule 11 of the Federal Rules of Civil
Procedure and the Court's inherent authority:

    (1)      Appropriate Monetary Sanctions against Mr. Fleming and
                    Ms. Wang;
    (2)      Revocation of Mr. Fleming's *Pro Hac Vice*; and
    (3)      An order that Mr. Fleming and Ms. Wang are jointly and
                    severally liable for payment of any attorneys' fees and
                    costs awarded to Irongate as the prevailing party in this
                    litigation.

Mot. for Sanctions at 3, Dkt. No. 202.

Irongate asserts that Wang and Fleming, with full knowledge of the facts set
forth above regarding the 2011 Agreement, initiated and maintained Plaintiffs'
baseless lawsuit, resulting in over five years of wasteful litigation and expense.
Irongate identifies in the evidentiary record several communications between Wang
and her former counsel—all provided to Fleming by no later than early

2012—unequivocally setting forth the parties' representations of their intent and demonstrating their understanding of the 2011 Agreement. Notwithstanding this knowledge regarding their present claims, Plaintiffs and Fleming persisted in advancing a theory of liability based upon a distortion of the parties' intent and omission of material facts with respect to the 2011 Agreement. In the face of the attorney-client communications demonstrating their inaccuracy, Plaintiffs and their counsel continued, unrelenting, to certify in their pleadings and argue before this Court, that the 2011 Agreement should be interpreted contrary to the undisputed evidence.[17] That conduct is not only untenable but warrants sanctions.

A. **Legal Framework for Rule 11 Sanctions**[18]

Rule 11 requires an attorney or unrepresented party to certify that "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for

---

[17]Nor were Plaintiffs or their counsel any more forthcoming to the Ninth Circuit, even when the specific issue presented to and concern expressed by the Ninth Circuit involved the ambiguities subsequently described by the Ninth Circuit it its November 2016 memorandum.

[18]As a preliminary matter, Plaintiffs object to the procedural mechanism for Irongate's request—arguing that the combined motion for sanctions pursuant to Rule 11 and the court's inherent authority runs afoul of Rule 11's safe-harbor provision. The Court finds the procedure employed by Irongate permissible under the circumstances. *See, e.g.*, *Ridder v. Springfield*, 109 F.3d 288, 294 (6th Cir. 1996) (holding that Rule 11 motions can be combined with a motion for sanctions pursuant to 28 U.S.C. § 1927 because the drafters intended Rule 11 motions to be filed separately from other motions on the merits but not necessarily from other motions regarding attorney behavior); *Kaplan v. Burrows*, No. 6:10-CV-95-ORL-35DAB, 2011 WL 5358180, at *5 (M.D. Fla. Sept. 6, 2011), *adopted as modified*, 2011 WL 5358666 (M.D. Fla. Oct. 31, 2011) (permitting Rule 11 sanctions as part of a larger motion for attorney's fees, costs, and sanctions based on multiple grounds).

establishing new law[.]"  Fed. R. Civ. P. 11(b)(2).[19]  "Rule 11 imposes a duty on

attorneys to certify that they have conducted a reasonable inquiry and have

determined that any papers filed with the court are well grounded in fact, legally

tenable, and not interposed for any improper purpose."  *Cooter & Gell v. Hartmarx*

*Corp.*, 496 U.S. 384, 393 (1990).   If the court finds a violation of Rule 11(b), "the

court may impose an appropriate sanction on any attorney, law firm, or party that

violated the rule or is responsible for the violation."   Fed. R. Civ. P. 11(c).   The

"central purpose of Rule 11 is to deter baseless filings in district court and thus . . .

streamline the administration and procedure of the federal courts."  *Id*.   Such

sanctions should not "be construed so as to conflict with the primary duty of an

---

[19]Section (b) provides in full:

> (b)   Representations to the Court. By presenting to the court a pleading, written
>        motion, or other paper--whether by signing, filing, submitting, or later
>        advocating it--an attorney or unrepresented party certifies that to the best of the
>        person's knowledge, information, and belief, formed after an inquiry
>        reasonable under the circumstances:
>
>        (1)   it is not being presented for any improper purpose, such as to harass,
>              cause unnecessary delay, or needlessly increase the cost of litigation;
>        (2)   the claims, defenses, and other legal contentions are warranted by existing
>              law or by a nonfrivolous argument for extending, modifying, or reversing
>              existing law or for establishing new law;
>        (3)   the factual contentions have evidentiary support or, if specifically so
>              identified, will likely have evidentiary support after a reasonable
>              opportunity for further investigation or discovery; and
>        (4)   the denials of factual contentions are warranted on the evidence or, if
>              specifically so identified, are reasonably based on belief or a lack of
>              information.

Fed. R. Civ. P. 11.

attorney to represent his or her client zealously" and are "reserve[d] . . . for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Id*. at 1344.[20]

In determining whether a party has violated Rule 11, the Court applies an objective reasonableness standard. *Yagman v. Republic Ins*., 987 F.2d 622, 628 (9th Cir. 1993). A showing of subjective bad faith is not required. *See Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994) (noting that sanctions cannot be avoided by the "empty head, pure heart" defense); *Zaldivar v. City of L.A.*, 780 F.2d 823, 831 (9th Cir. 1986), *overruled on other grounds by Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384 (1990) (noting that the certification requirements of Rule 11 are violated "if the paper filed . . . is frivolous, legally unreasonable or without factual foundation, even though . . . not filed in subjective bad faith").

As applied to complaints, the Ninth Circuit has interpreted the Rule 11 standard as requiring a "'a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it.'" *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (quoting *Christian v. Mattel,*

---

[20]The Court recognizes that Rule 11 sanctions are "an extraordinary remedy, one to be exercised with extreme caution." *Operating Eng'rs Pension Trust v. A-C Co*., 859 F.2d 1336, 1345 (9th Cir. 1988). Up to now, the Court has never imposed Rule 11 sanctions on any party or its counsel, in part, in recognition of the limited circumstances justifying their imposition.

*Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002)); *see also Rey v. Countrywide Home Loans, Inc.*, No. CIV. 11-00142 JMS, 2011 WL 4103704, at *3 (D. Haw. Sept. 13, 2011) ("A complaint is 'frivolous' if it 'is *both* baseless and made without a reasonable and competent inquiry.'") (quoting *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005)). Rule 11 also "subject[s] litigants to potential sanctions for insisting upon a position after it is no longer tenable. . . ." Fed. R. Civ. P. 11 advisory committee's note (1993). The Court addresses these standards, in turn, and finds that Rule 11 sanctions are warranted under the specific circumstances here.

## B. Sanctions Are Warranted Against Fleming

Upon careful consideration of the entire record, the Court finds the FAC, filed on November 2, 2017, to be baseless in light of the facts known to Fleming at the time of filing.[21] Indeed, the Sunday's Companies' own lawyers told Wang several

---

[21]Although Fleming, admitted as *pro hac vice* counsel on March 28, 2017 (Dkt. No. 76), did not himself sign the November 2, 2017 FAC, his name appears on the pleadings as an attorney for Plaintiffs, and his actions—including advocating these positions during oral arguments to the Court in opposition to the summary judgment motions—ratified the assertions set forth in the pleadings. The Rule 11 advisory committee's note (1993) explains: "The sanction should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule or who may be determined to be responsible for the violation. . . . The revision [to subsection (c)] permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation." *See Religious Tech. Ctr. v. Gerbode*, No. CV 93-2226 AWT, 1994 WL 228607, at *5 (C.D. Cal. May 2, 1994) (finding upon consideration of the Advisory Committee Notes to the 1993 Amendments, "[i]t, thus, appears that the court has the authority to sanction a co-counsel law firm, as well as the primary offending firm, even though co-counsel did not sign the offending pleading"); *see also Gold v. Harrison*, 88 Hawai'i 94, 105, 962 P.2d 353, 364 (1998) (The Hawaii Supreme Court upheld Hawaii Rule of Civil Procedure 11 sanctions where, "although Pickett did not sign the complaint, Pickett is responsible for the claim against Harrison in the complaint because:

times, and no later than May 25, 2011, that the 2011 Agreement waived and released

claims for the Sunday's Companies' original deposits and that they forfeited any

claim for the return of deposits by defaulting on the Agreement.   *See* Irongate Ex. U

(5/25/11 Email and from Price).   Sometime shortly after Price sent Wang the May

25, 2011 letter, Plaintiffs' relationship with Price and Hosoda terminated,[22] and

Fleming began representing the Sunday's Companies.   Decl. of J. Patrick Fleming,

Jr. ¶ 6, Dkt. No. 216-1.   In June 2011, Price attempted to communicate with

Fleming about the 2011 Agreement, leaving him several telephone messages.

Fleming, however, "was suspicious about Mr. Price's motives, and saw no

immediate need to get back to him," and never returned his calls.   Fleming Decl.

¶ 10.   On December 22, 2011, Fleming requested that Price provide him a copy of

the contents of Price's client file for the Sunday's Companies.   Price complied by

March 29, 2012.   Fleming Decl. ¶¶ 13, 15.

Significantly, Fleming acknowledges that Price's file contained the May 25,

2011 email and letter advising Wang that under the terms of the 2011 Agreement,

the Sunday's Companies "released certain claims."   Fleming Decl. ¶ 17.   Fleming

---

(1) Pickett's name was listed in the complaint as an attorney for the Plaintiffs; and (2) his actions later ratified or indicated that he adopted the signature of the attorney who did sign the complaint.") (citing *Blossom v. Blackhawk Datsun, Inc.*, 120 F.R.D. 91, 101 (S.D. Ind. 1988)).
[22]Price testified that he received a letter from Fleming indicating that Price "has not represented [Wang] after the day of the settlement agreement," on or around May 13, 2011.   1/15/18 Price Dep. Tr. 135–36.

concedes that "the letter further informed Ms. Wang that Irongate was asserting that a failure to cure would mean that Plaintiffs would lose the right to purchase the units and would lose the deposits. Admittedly, Mr. Price's letter stated that by defaulting Plaintiffs had lost any claim for return of the deposits." Fleming Decl. ¶ 17.

Although Fleming counters that Price's letter "was not consistent with [Fleming's] understanding of the law concerning liquidated damages provisions or the *plain language* of the Agreement," Fleming Decl. ¶ 17, the Ninth Circuit determined on November 15, 2016 that the 2011 Agreement was, on its face, ambiguous and therefore, "the intent of the parties is a question for the trier of fact." 666 F. App'x at 589. One year after the Ninth Circuit's determination and remand, the Sunday's Companies filed the FAC, once more seeking a return of their original deposits, alleging that the 2011 Agreement did not release their claims despite Wang and Fleming's knowledge regarding the intent and understanding of the parties. Based on the totality of the circumstances—and especially in light of the Ninth Circuit's remand for the express purpose of determining the intent of the parties—the Court finds that the FAC is both baseless and made without a reasonable and competent inquiry.

First, for many of the reasons discussed above, Plaintiffs' claims under various theories for the return of any portion of their original deposits are factually and legally baseless in view of Fleming's acknowledged possession of the relevant

attorney-client communications and copies of communications between Wang and

Grosfeld demonstrating the course of dealing and intent of the parties governing this

Court's interpretation of the 2011 Agreement.  *See* Fleming Decl. ¶ 23.

Second, the "reasonable inquiry test is meant to assist courts in discovering

whether an attorney, after conducting an objectively reasonable inquiry into the facts

and law, would have found the complaint to be well-founded."  *Holgate*, 425 F.3d

at 677 (citing *Christian*, 286 F.3d at 1127).  "Such inquiry is that amount of

examination into the facts and legal research which is reasonable under the

circumstances of the case."  *Zaldivar*, 780 F.2d at 831.  Plaintiffs' counsel fails

this inquiry as well.  "[P]rior to filing a complaint" an attorney must "conduct a

reasonable factual investigation" and must "also perform adequate legal research

that confirms whether the theoretical underpinnings of the complaint are 'warranted

by existing law or a good faith argument for an extension, modification or reversal

of existing law.'"  *Christian*, 286 F.3d at 1127 (quoting *Golden Eagle Distrib.*

*Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1537 (9th Cir. 1986)).

Fleming, in light of his undisputed knowledge of the facts from the inception

of the litigation, could not objectively believe that the claims in the FAC are

well-founded.[23]  It is clear that "sanctions are not appropriate in every case in which

---

[23]Indeed, because Fleming undisputedly possessed knowledge of the particular facts that doom
Plaintiffs' claims, he may not escape responsibility for certifying baseless claims without

summary judgment is granted, and that the failure of a plaintiff's factual allegations to find sufficient support in the record to survive summary judgment is not, in and of itself, sanctionable." *Schrag v. Dinges*, 73 F.3d 374 (10th Cir. 1995) (citations omitted). This matter, however, involves much more than the mere failure of Plaintiffs' allegations to survive summary judgment. Counsel was specifically informed, before Plaintiffs initially filed suit and before counsel certified the FAC, that the material facts upon which the Sunday's Companies' claims were based were untenable. He then continued to "insist[] upon a position after it [was] no longer tenable," Fed. R. Civ. P. 11 advisory committee's note (1993), going so far as to continue with his "alternate" reading of the 2011 Agreement in an effort to persuade the Ninth Circuit to reverse this Court's motion to dismiss ruling, when he knew that this perceived ambiguity was of his own creation and was contradicted by the record. The deception did not end there. Upon obtaining reversal, and in an overzealous attempt to defeat Irongate's motion for summary judgment, counsel continued to push his interpretation of the 2011 Agreement, even though that

---

conducting a reasonable inquiry by using local counsel as a shield. *See* Fleming Decl. ¶¶ 27–36. There is no assertion or evidence that Plaintiffs' many prior counsel, including Bernard Bays, Michael Green, or Brian Mackintosh ever had access to Price's file or the attorney-client communications produced as a result of Irongate's Motion to Compel. Fleming, however, had knowledge of the facts and many of the purportedly privileged records before any of the pleadings were filed in this case.

interpretation could not be reconciled with those, including his own client's attorneys at the time, responsible for negotiating the Agreement.

By determining that Plaintiffs' counsel fails this inquiry, the Court recognizes that Rule 11 should not be used to discourage appropriately zealous advocacy or to deter novel legal arguments. *See In re Keegan Mgmt. Co. Sec. Litig.*, 78 F.3d 431, 435 (9th Cir. 1996) ("Rule 11 must be read not only to give effect to the Rule's central deterrent goals, but also 'in light of concerns that it will spawn satellite litigation and chill vigorous advocacy[.]'") (quoting *Cooter & Gell*, 496 U.S. 384, 393 (1990)); Fed. R. Civ. P. 11 advisory committee's note (1983) ("The Rule is not intended to chill enthusiasm or creativity in pursuing factual or legal theories."). However, the claims certified in the pleadings and arguments made before the Court cannot be characterized as "creative" or "zealous" legal arguments where they are directly contrary to and/or wholly unsupported by the evidence, the law of the case, and clear and controlling existing law. Further, despite whatever Fleming may subjectively believe about the validity of his interpretation of the 2011 Agreement, Section D.37, and Plaintiffs' claims, Rule 11 is an objective standard. *See Smith*, 31 F.3d at 1488 (noting that sanctions cannot be avoided by the "empty head, pure heart" defense). Viewed objectively, the claims in the November 2, 2017 FAC were baseless and no reasonable attorney knowing what Fleming knew would have included them as pled after the Ninth Circuit's November 15, 2016 decision.

In sum, based on the information known to Fleming at the time he filed the FAC and later advocated in support of Plaintiffs' claims in opposition to Irongate's summary judgment motions, the Court concludes that Fleming's conduct warrants the imposition of Rule 11 sanctions.

## C. Sanctions Are Warranted Against Wang

For similar reasons, the Court determines that sanctions are warranted against Plaintiffs' sole member/manager, Wang. First, sanctions are warranted under Rule 11(b)(3) because Wang was clearly responsible for Plaintiffs' role in the filing of pleadings and papers, including supporting affidavits, deposition testimony, and exhibits, that had no factual basis.[24] In light of the evidence detailed above, and revealed (1) during the depositions of Wang, Price, and Hosoda, and (2) in the attorney-client communications produced in response to Irongate's Motion to Compel, Wang knew or reasonably should have known from the inception of this case in 2013 that Plaintiffs' claims for the return of her deposits were brought without evidentiary support and without any reasonable expectation that the

---

[24]Although courts are forbidden from imposing monetary sanctions on a *party* for a violation of Rule 11(b)(2), *i.e.*, when a pleading advances a legal theory that is unwarranted under existing law or a nonfrivolous extension of existing law, that prohibition does not apply to Plaintiffs' violation of Rule 11(b)(3). *See* Fed. R. Civ. P. 11(c)(5)(A) ("The court must not impose a monetary sanction . . . against a represented party for violating Rule 11(b)(2)."); *see also Tacoronte v. Cohen*, 654 F. App'x 445, 449 (11th Cir. 2016) ("Rule 11 does not permit sanctioning a client, however, when the basis for the sanction is that the pleading was legally frivolous.") (citing *Byrne v. Nezhat*, 261 F.3d 1075, 1118 (11th Cir. 2001) *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

discovery process would produce any evidentiary support for these claims.[25]   *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 851 F. Supp. 2d 1299, 1322 (S.D. Fla. 2011) ("Sanctions against a represented party are warranted when the party knew or should have known that the allegations contained in the complaint were frivolous. . . . A client may also be subject to sanctions when it is clear that he is the mastermind behind a frivolous case.").

Second, under the Court's inherent authority, it may also sanction a represented party for conduct related to initiating and conducting litigation.   *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001).   In such cases, "sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith [and] are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose."   *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091, 1108 (9th Cir. 2002) (citation omitted).   This power is entrenched in the courts' well-established equitable authority "to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation."   *Chambers*, 501 U.S. at 48 (citing the Advisory

---

[25]For example, communications from Price and Hosoda, both before and after execution of the 2011 Agreement, informed Wang that the original deposits would not be recoverable.   *See* Irongate Ex. Y (2/22/2011 Price Email), Dkt. No. 171; Irongate Ex. Z (2/28/2011 Hosoda Letter), Dkt. No. 181; Irongate Ex. EE (4/8/2011 Price Email and Letter), Dkt. No. 182.

Committee's Notes on the 1983 Amendment to Rule 11). The Court's inherent

power is to be used with restraint and discretion, but is particularly appropriate

where the conduct at issue is not covered by one of the other sanctioning provisions.

*Id*. at 44–46, 50. In view of the foregoing, the Court finds that Wang's reckless

and/or knowing conduct in this case was tantamount to bad faith in instituting and

conducting litigation and therefore sanctionable under the Court's inherent power.

Because Plaintiffs (through Wang) aided their attorney in filing baseless pleadings

based upon knowingly false information, the Court finds that Plaintiffs may be

sanctioned under the Court's inherent authority. *See Seare v. St. Rose Dominican

Health Found.*, No. 2:10-CV-02190-KJD, 2011 WL 5101972, at *2 (D. Nev. Oct.

25, 2011) (citing *Business Guides v. Chromatic Communications Enters*., 892 F.2d

802, 811 (9th Cir. 1989)).

Because Wang herself is responsible for the aforementioned lapses, for

engaging in dilatory conduct, and for the reasons detailed in the records filed under

seal in support of Irongate's Motion for Sanctions (*see* Dkt. Nos. 202, 211, 222,

223), the Court imposes sanctions under its inherent authority on Wang individually.

The four LLC Plaintiffs are devoid of significant assets, and were formed

exclusively for the purpose of purchasing the four Project Units. 10/7/17 Wang

Dep. Tr. 255. Although Wang is not a party to the litigation, she is the sole owner

and member of the Sunday's Companies, *id.*, with complete dominion and control

over all aspects of the relevant transactions, so that the Sunday's Companies had no

separate mind, will or existence of their own. Therefore, the Court finds that

imposing sanctions against Wang *due to her conduct in this litigation* comports with

principles of due process and the Court's exercise of personal jurisdiction, for the

limited purpose of Irongate's Motion for Sanctions.[26] *See, e.g.*, *Aldmyr Sys., Inc. v.*

*Friedman*, 215 F. Supp. 3d 440, 465 (D. Md. 2016), *aff'd*, 679 F. App'x 254 (4th

Cir. 2017) (imposing Rule 11 sanctions against CEO of represented party,

concluding that "[a]s CEO and controlling shareholder of the Plaintiff

corporations—who at various times has characterized himself as the 100% owner of

the corporate Plaintiffs, and other times less than 100%, but at all times indisputably

the controlling individual of the corporations—he must be held personally liable,

jointly and severally, with his corporations and [their attorney]. It was Mr. Bailey[,

the CEO] and he alone who was the principal beneficiary of this litigation."); *In Re*

*Rainbow Magazine*, 77 F.3d 278 (9th Cir. 1996) (recognizing inherent authority of

bankruptcy courts to impose sanctions upon non-parties who participate in vexatious

---

[26]*Cf. Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 392 (4th Cir. 2018) ("When a company is
an alter ego of its sole member, the alter ego and the member are effectively the same entity.
Accordingly, the jurisdictional contacts of [the individual] are the jurisdictional contacts of the
[alter ego entity]. Moreover, when reverse veil piercing of a single-member LLC is involved, the
individual already is properly before the court. Thus, there is no concern that the alter ego LLC
controlled by that individual must somehow receive independent notice of a legal action.")
(internal citations and quotation marks omitted); *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1072–73 (9th
Cir. 2015) (noting that alter ego test "may be used to extend personal jurisdiction").

litigation conduct); *David v. Hooker, Ltd*., 560 F.2d 412, 420–21 (9th Cir. 1977) (affirming district court order requiring corporate defendant's sole non-party officer to pay plaintiff's expenses resulting from corporate defendant's failure to answer interrogatories); *Amerisource Corp. v. Rx USA Int'l Inc*., No. 02-CV-2514 (JMA), 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010) (Imposing sanctions against non-party, "the majority shareholder, chief executive, and only person affiliated with RxUSA to have a substantive role in this litigation" where the non-party "managed the litigation on RxUSA's behalf and represented RxUSA at every step[,] RxUSA acted only through him and RxUSA does not dispute that [his] conduct is attributable to RxUSA"), *aff'd sub nom. New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25 (2d Cir. 2011); *Manez v. Bridgestone Firestone North American Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."); *Thomas Am. Corp. v. Fitzgerald,* 175 F.R.D. 462, 464, 466–67 (S.D.N.Y.) (1997) (ordering corporate plaintiff's former CEO to pay a fine pursuant to Rule 11 for filing a declaration that contained a factual misstatement); *Helmac Products Corp. v. Roth (Plastics) Corp*., 150 F.R.D. 563, 564–68 (E.D. Mich. 1993) (holding that the court has the inherent power to sanction a nonparty that is not subject to court order if the nonparty had a

substantial interest in the outcome of the litigation and substantially participated in the proceedings).

In light of the foregoing, the Court finds that sanctions are appropriate against Wang individually.

**D.**     **Monetary Sanctions Are Appropriate Under the Circumstances**

A determination of sanctions under Rule 11 is largely within the discretion of the Court, guided by these principles:

> A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c)(4).

Weighing the extent of the violations as well as the need to deter repetition of similar conduct in both this action and in other actions, the Court finds that monetary sanctions against Fleming and Wang are warranted.[27]   Specifically, the Court finds

_____

[27]Commentary to the Rule outlines a non-exhaustive list of factors a court should consider "in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances," including:

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar

appropriate a monetary sanction against each in the amount of $850.00 payable to the Court.   This monetary sanction is limited but nonetheless appropriate to deter future conduct in this and other actions, and to deter comparable conduct by others similarly situated.   *See, e.g.*, *Rey v. Countrywide Home Loans, Inc.*, Civ. No. 11-00142 JMS, 2011 WL 4103704, at *6 (D. Haw. Sept. 13, 2011) (imposing sanction of $750.00 payable to the court against attorney for filing amended complaint that included claims that are legally baseless and which the court had already dismissed without leave to amend); *Medina v. Gridley Union High Sch. Dist.*, 172 F.3d 57 (9th Cir. 1999) (affirming portion of district court's order imposing Rule 11 sanctions against attorney for filing claim with no factual basis in the amount of $1,000.00); Fed. R. Civ. P. 11 advisory committee's note (1993) ("Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty.").

---

conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations.   The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.

Fed. R. Civ. P. 11 advisory committee's note (1993).

The Court accordingly imposes monetary sanctions against Plaintiffs' counsel, Fleming, pursuant to Rule 11.   Under Rule 11 and its inherent authority, the Court exercises its discretion to impose the same sanction against Wang.   The Court declines Irongate's request to revoke Fleming's permission to appear in this case *pro hac vice*.   The Court also denies without prejudice as premature the request for an order that Fleming and Wang are "jointly and severally liable for payment of any attorneys' fees and costs awarded to Irongate as the prevailing party in this litigation"—any such request may be addressed as part of an appropriate motion for fees and costs.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Irongate's Motion for Summary Judgment on Plaintiffs' First Amended Complaint (Dkt. No. 132), and Irongate's Motion for Summary Judgment on Irongate's Counterclaim for Plaintiffs' Breach of Contract for Failure to Make the Additional Nonrefundable Payment (Dkt. No. 134).

The Court GRANTS IN PART Irongate's Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure (Dkt. No. 202), and sanctions Fleming and Wang, individually, $850.00 each.   By July 2, 2018, Fleming and Wang shall each deliver a check for $850.00, payable to "Clerk, U.S. District

Court."   Each check should reflect the notation "Civ. No. 13-00502 DKW-RLP"

and should be accompanied by a copy of this Order.

IT IS SO ORDERED.

DATED: June 6, 2018 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge

*Sunday's Child, LLC et al. v. Irongate AZREP BW LLC*, CV. NO. 13-00502 DKW-RLP; **ORDER (1) GRANTING DEFENDANT IRONGATE'S MOTIONS FOR SUMMARY JUDGMENT; AND (2) GRANTING IN PART AND DENYING IN PART IRONGATE'S MOTION FOR SANCTIONS**

56